[Cite as *State v. Harmon*, 2013-Ohio-1769.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No.    26502 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| GEORGE F. HARMON, JR. | | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | | CASE No.    CR 10 07 1974 |

DECISION AND JOURNAL ENTRY

Dated: May 1, 2013

BELFANCE, Presiding Judge.

**{¶1}** Defendant-Appellant George Harmon appeals from his resentencing in the Summit County Court of Common Pleas. For the reasons stated below, we affirm.

I.

**{¶2}** As of July 2010, the victim and Mr. Harmon had been dating for approximately three years and living together for a year. A friend of the victim indicated that Mr. Harmon was very controlling of the victim and that, when he was not with her, he would frequently call to check up on her. A couple of days prior to July 17, 2010, the victim had left the shared residence because she and Mr. Harmon had an argument. On July 17, 2010, the victim received a message from Mr. Harmon asking her to come over to talk. The victim arrived at the residence around 3:30 p.m. and sat down in the living room near Mr. Harmon. At the time, the victim was talking to her mother on her cell phone. Right after the victim got off the phone, Mr. Harmon slammed the door, locked it, and began hitting the victim and punching her in the head. He told her that

he was going to kill her and that that day would be her last day alive. He continued yelling at her and hitting her.

{¶3} When Mr. Harmon stopped yelling and hitting the victim, the two went out on the front porch to smoke a cigarette and were talking. While on the porch, the victim received a phone call. The victim told Mr. Harmon it was her mom, but Mr. Harmon grabbed the phone from her. The victim tried to leave when one of Mr. Harmon's friends briefly stopped by, but Mr. Harmon pushed her back inside. Mr. Harmon became angry and began accusing the victim of making him look bad in front of his friends. At this point Mr. Harmon grabbed a sharpened wooden stick and began stabbing the victim in the arm four or five times to the point that she was bleeding. Mr. Harmon then told the victim that she needed to go upstairs and clean herself off in the shower.

{¶4} Mr. Harmon continued to berate the victim while she was in the shower; he continued hitting and punching her and put a lit cigarette out on her face. Mr. Harmon then went into the bedroom, took some of the victim's clothes, and set them on fire. Mr. Harmon then threw the clothes that were on fire into the shower with the victim. He closed the door to the bathroom and told her that she "should just die of smoke inhalation * * *."

{¶5} The victim got out of the shower and went and sat on the bed. Mr. Harmon sat with her. The victim noted that "he was trying to talk to [her,] and [they] would talk and then he would get mad again and start yelling and screaming and hitting [her] some more." Mr. Harmon kept accusing the victim of cheating on him and every time she would answer that she was not, he would say she was and start hitting or punching her again. Finally, the victim told Mr. Harmon that she was cheating on him. According to the victim, Mr. Harmon called the victim a

"ho" and told her that he would "show [her] how ho's get treated." Mr. Harmon then proceeded to engage in anal and vaginal intercourse with the victim.

{¶6} Afterwards, the two got up and went to clean themselves up in the bathroom. Mr. Harmon again started talking about the victim cheating on him, and then grabbed the victim around her neck, pushed her onto the bed and started choking her, causing her to lose consciousness for a few seconds. Mr. Harmon jumped off of her, let her get up and get dressed and had her come downstairs with him. Mr. Harmon began to try to help treat the victim's injuries.

{¶7} Mr. Harmon then began to get concerned that the victim would tell on him and began to say that he had to "finish the job[.]" He began to accuse the victim of giving other people money and stated that he deserved money, too. He then made the victim go with him in her car to her mother's house approximately 15 minutes away and had the victim go inside. The victim's mother was not home; her brother was, but he would not answer his door. Because Mr. Harmon had, previously during the course of the evening, threatened to harm her brother and her mother, the victim did not further pursue trying to get her brother to open his door. The victim retrieved a blank check, and Mr. Harmon drove them to Giant Eagle. The victim went inside and cashed the check for $30 around 9:30 p.m. and gave the money to Mr. Harmon.

{¶8} The victim then asked Mr. Harmon to stop somewhere and get her something to drink. Mr. Harmon then drove them to a Circle K and went inside and bought the victim a "Polar Pop." Mr. Harmon drove them back to their residence. Mr. Harmon phoned someone and a person came over and sold Mr. Harmon crack. Mr. Harmon then smoked the crack and made the victim do so as well. Afterward, the victim fell asleep on the couch. Around 3:30 or 4 a.m., Mr. Harmon woke the victim and told her to come upstairs with him. She refused

indicating that she had to be to work in a couple hours. Mr. Harmon told her that she was not going in to work, proceeded to call her employer, and reported that she was sick. The two then went upstairs to bed.

{¶9} Around 11:30 a.m. or 12 p.m. on July 18, 2010, Mr. Harmon and the victim got up. Shortly thereafter, the victim's mother showed up because she was concerned about her daughter. Initially, Mr. Harmon told the victim to go upstairs. However, ultimately, Mr. Harmon realized that the victim's mother was not leaving. He told the victim not to say that he had caused her injuries and let the victim go to the door.

{¶10} The victim left and they went to her mother's house where they met the victim's friend. From there, the police were called and the victim went to a hospital to be examined. The victim's numerous injuries were documented. Her injuries included burst capillaries in one of her eyes, which evidences prior strangulation. Imaging studies revealed an air embolus in the victim's throat. Because this complication of strangulation could potentially be deadly, the victim was admitted to the hospital.

{¶11} Based upon the foregoing, Mr. Harmon was indicted on one count of attempted murder, two counts of rape, three counts of kidnapping, one count of felonious assault, two counts of domestic violence, and one count of arson. The matter proceeded to a jury trial. Mr. Harmon testified on his own behalf and told the jury a different version of events. During his testimony, he denied most of the allegations but admitted that he had committed domestic violence. The jury found Mr. Harmon not guilty of attempted murder, the two counts of rape, and the one count of kidnapping based upon kidnapping for the purpose of engaging in sexual activity. Mr. Harmon was found guilty of two counts of kidnapping, two counts of domestic violence, one count of felonious assault and one count of arson. The trial court merged the two

kidnapping counts and only imposed a single sentence for kidnapping. Mr. Harmon was sentenced to an aggregate total of thirteen years in prison.

{¶12} Mr. Harmon appealed, asserting that his convictions for kidnapping, domestic violence, and felonious assault were allied offenses of similar import. *See State v. Harmon,* 9th Dist. No. 25756, 2012-Ohio-903, ¶ 4. Because *State v. Johnson,* 128 Ohio St.3d 153, 2010-Ohio-6314, was decided prior to the trial court sentencing Mr. Harmon, we remanded the matter so that the trial court could consider and apply *Johnson* in the first instance. *Id.* at ¶ 5.

{¶13} The trial court conducted a new sentencing hearing. The trial court concluded that the State had to elect which kidnapping count on which to proceed. The State elected to have Mr. Harmon sentenced on count five, and the trial court thereafter concluded that it was required to dismiss count four. The trial court concluded that none of the other offenses should merge and sentenced Mr. Harmon to an aggregate sentence of 13 years. Mr. Harmon has again appealed, raising a single assignment of error for our review.

II.

ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED WHEN IT IMPOSED SEPARATE SENTENCES FOR OFFENSES THAT AROSE FROM THE SAME CONDUCT, WERE NOT COMMITTED SEPARATELY OR WITH A SEPARATE ANIMUS, AND SHOULD HAVE BEEN MERGED FOR SENTENCING PURPOSES UNDER R.C. 2941.25.

{¶14} Mr. Harmon asserts in his sole assignment of error that the trial court erred in imposing separate sentences for offenses that arose from the same conduct. Specifically, Mr. Harmon argues that count five of kidnapping and count seven of felonious assault should have merged and that count seven of felonious assault and count eight of domestic violence should

have merged.[1]  We do not agree.  However, we do agree with Mr. Harmon that the trial court should not have dismissed count four of the indictment when it merged counts four and five. Nonetheless, because the State has not sought review of this issue, we are unable to correct the error.  *See generally Greenlaw v. United States*, 554 U.S. 237, 244-245 (2008) ("This Court, from its earliest years, has recognized that it takes a cross-appeal to justify a remedy in favor of an appellee.").

{¶15}  The Supreme Court of Ohio had held that "a reviewing court should review the trial court's R.C. 2941.25 determination de novo."  *State v. Williams,* 134 Ohio St.3d 482, 2012-Ohio-5699, ¶ 1.

{¶16}  Ohio's allied offense statute is codified at R.C. 2941.25.  It provides that

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

{¶17}  "To ensure compliance with both R.C. 2941.25 and the Double Jeopardy Clause, a trial court is required to merge allied offenses of similar import at sentencing."  (Internal quotations and citation omitted.)  *Williams* at ¶ 15.  However, "[b]ecause R.C. 2941.25(A) protects a defendant only from being punished for allied offenses, the determination of the defendant's guilt for committing allied offenses remains intact, both before and after the merger

---

[1] Mr. Harmon does not argue that count nine, his misdemeanor domestic violence conviction should have merged with any other offense.  Thus, such will not be part of our analysis.

of allied offenses for sentencing." *State v. Whitfield,* 124 Ohio St.3d 319, 2010-Ohio-2, paragraph three of the syllabus.

**{¶18}** Based upon the foregoing, we conclude the trial court erred in dismissing count four. *See id.* The trial court was correct that Mr. Harmon could not be sentenced on count four after it concluded that counts four and five merged and the State elected to sentence Mr. Harmon on count five. *See id.* at ¶ 24. However, it erred in concluding that it was then required to dismiss the merged count. *See id.* at paragraph three of the syllabus. The guilty verdict on count four should have remained intact.

**{¶19}** "When determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered." *Johnson*, 128 Ohio St.3d 153, 2010–Ohio–6314, at syllabus.

> First, one must determine whether the offenses at issue could be committed by the same conduct. One does so by asking whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. Second, one must ask whether the offenses actually were committed by the same conduct, i.e., a single act, committed with a single state of mind. If the answer to both inquiries is yes, the offenses will merge.

(Emphasis deleted.) (Internal quotations and citations omitted.) *State v. Washington,* 9th Dist. No. 11CA010015, 2012-Ohio-2117, ¶ 8. We have previously concluded that, "in making its allied offense determination, a trial court must be guided by a review of the evidence introduced at trial and constrained by the theories and legal arguments set forth by the State." *See id.* at ¶ 9, 16-17.

**Kidnapping and Felonious Assault**

**{¶20}** Mr. Harmon first argues that his convictions for kidnapping under count five and felonious assault pursuant to count seven should have merged. We do not agree.

**{¶21}** Mr. Harmon was convicted of kidnapping in violation of R.C. 2905.01(A)(3) which states that "[n]o person, by force, threat, or deception * * * shall remove another from the place where the other person is found or restrain the liberty of the other person * * * [t]o terrorize, or to inflict serious physical harm on the victim or another[.]" In addition, Mr. Harmon was convicted of felonious assault in violation of R.C. 2903.11(A)(1), which states that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * * ." R.C. 2901.01(A)(5) defines serious physical harm as:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

**{¶22}** First, we examine whether it is possible to commit kidnapping as defined by R.C. 2905.01(A)(3) and commit felonious assault as defined by R.C. 2903.11(A)(1) with the same conduct. *See Johnson,* 128 Ohio St.3d 153, 2010–Ohio–6314, at ¶ 48. The State does not dispute that it is possible to commit both kidnapping and felonious assault with the same conduct. We agree. Thus, the main question presented for review is whether the offenses of kidnapping and felonious assault were committed separately or with a separate animus. *See id.* at ¶ 51 ("[I]f the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge.").

**{¶23}** It is clear from the State's closing argument at trial and the State's arguments at the resentencing that the State's theory of the case was that felonious assault occurred when Mr.

Harmon strangled the victim. Mr. Harmon asserts that, because a kidnapping occurred via the same conduct, the offenses should merge. He also maintains that the kidnapping was committed for the purpose of facilitating the felonious assault and, thus, he acted with a single animus. To the extent that the restraint at issue is limited to the act of strangling the victim, we agree that the offenses were committed with the same conduct with a single animus. However, in examining Mr. Harmon's conduct in this case, the restraint of the victim forming the basis of the offense of kidnapping under R.C. 2905.01(A)(3) was not limited to the action of strangling the victim. *See State v. Carver,* 2d Dist. No. 24400, 2011-Ohio-5955, ¶ 37-39. In other words, Mr. Harmon did not commit one single act of kidnapping that was incidental to the act of strangulation.

{¶24} Because the State did not define in the indictment or at trial the conduct that it believed constituted the kidnapping with respect to count five, it is impossible to say for certain what conduct the jury concluded constituted the kidnapping. The indictment itself states that the act of kidnapping occurred "on or about July 17, 2010 through July 18, 2010." Given the episodic nature of the course of events which involved instances of violence separated by calmer periods of talking, the jury could have concluded that one of the episodes constituted the kidnapping. For instance, the victim testified that, shortly after she arrived, Mr. Harmon locked the door and began to yell at her, hit her, and threaten her life. He told her that "today would be [her] last day to live, that he was going to kill [her], that he sat there and thought about how he was going to kill [her]." Clearly, such would be terrifying. *See* R.C. 2905.01(A)(3). Moreover, the jury could have concluded that this instance of kidnapping concluded when Mr. Harmon calmed down and the two proceeded out to the porch to talk and smoke cigarettes. The episode was distinctly separated in time from the strangulation that the State asserted constituted the felonious assault. Thus, the trial court could have concluded that the offenses should not merge

because the kidnapping occurred during this first episode of violence and, therefore, occurred separate and apart from the felonious assault (i.e. strangulation), which happened much later and after other instances of violence, sex, and arson.

{¶25} Alternatively, the jury could have concluded that the offense of kidnapping as provided by R.C. 2905.01(A)(3) began at 3:30 p.m. on July 17, 2010, and did not end until late morning or early afternoon on July 18, 2010; thus, encompassing a very long period of time, of which the strangulation was a brief event. Therefore, the kidnapping would in no way be merely incidental to the felonious assault. Notably, both the State's opening and closing arguments focused on fear, i.e. that the victim was afraid because of Mr. Harmon's actions and threats. Moreover, the State noted in its opening statement that the victim was not free to leave, that early on in the series of events the victim tried to leave and Mr. Harmon prevented her from doing so, and that this type of restraint "went on for hours in the home." Moreover, the evidence presented at trial supports the notion that the victim's liberty was restrained for an extended period of time and that Mr. Harmon terrorized the victim via numerous threats which occurred over that extended period of time. *See* R.C. 2905.01(A)(3); *see also State v. Logan,* 60 Ohio St.2d 126 (1979), syllabus ("[W]here the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions[.]"); *see Carver* at ¶ 38 (applying *Logan* post-*Johnson*). Thus, the trial court could have concluded that the kidnapping and felonious assault were committed separately because the kidnapping occurred over an extended period of time and, thus, was not merely incidental to the felonious assault. *See Logan* at syllabus. Because we conclude that the offense of kidnapping occurred

separately from the offense of felonious assault, we conclude the trial court did not err in failing to merge them. *See Johnson,* 128 Ohio St.3d 153, 2010–Ohio–6314, at ¶ 51.

**Felonious Assault and Domestic Violence**

{¶26} Mr. Harmon additionally argues that his convictions for felonious assault based upon count seven of the indictment and domestic violence based upon count eight of the indictment should have merged. We do not agree.

{¶27} As noted above, the statute prohibiting felonious assault provides that "[n]o person shall knowingly * * * [c]ause serious physical harm to another * * * ." R.C. 2903.11(A)(1). In addition, Mr. Harmon was convicted of violating R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." Neither side disputes that it is possible to commit both felonious assault and domestic violence with the same conduct. Thus, the question presented is whether the offenses of felonious assault and domestic violence were committed separately or with a separate animus. *See Johnson* at ¶ 51.

{¶28} As noted above, the State's theory of the case was that Mr. Harmon committed felonious assault when he strangled the victim. It is less clear from the trial testimony which particular conduct the State was asserting constituted domestic violence. However, the State in closing stated that domestic violence only required proof of physical harm, not serious physical harm as required for felonious assault. Thus, the State argued that the harm could be "an injury of any gravity or duration[]" and that it could be "very minor." The State also pointed out that, in fact, there does not have to be an injury because the statute indicates that the defendant has to cause or attempt to cause physical harm. Thus, it does not appear that the State limited itself at trial as to what could constitute the physical harm required for the domestic violence.

Nonetheless, implicit in the closing argument is that the physical harm would be some harm other than the strangulation the State believed constituted the felonious assault. At the resentencing hearing, the State asserted that the domestic violence occurred when Mr. Harmon stabbed the victim with a wooden stick, burned her in the face with a cigarette, and repeatedly struck her with his hands. The State also pointed out that minutes to an hour passed between many of the incidents of violence.

{¶29} The evidence, as described by the victim, supports the State's position. There was testimony that, shortly after the victim arrived at 3:30 p.m., Mr. Harmon began hitting her. Then Mr. Harmon calmed down, and the two went out on the porch to talk, at which time the victim attempted to leave and was pushed back inside by Mr. Harmon. It was at this point that Mr. Harmon stabbed the victim with a wooden stick causing her to bleed. Next, Mr. Harmon ordered the victim to go upstairs and take a shower to clean off the blood. It was while the victim was in the shower that Mr. Harmon burned the victim in the face with a cigarette. Following this, the series of events constituting the charges for arson and rape took place. Only then did Mr. Harmon strangle the victim, the act which the State asserted constituted felonious assault. Accordingly, we cannot say the trial court erred in finding that the offense of domestic violence was committed separately from the offense of felonious assault or that Mr. Harmon had a separate animus for committing each. *See Johnson,* 128 Ohio St.3d 153, 2010–Ohio–6314, at ¶ 51; *State v. Damron,* 10th Dist. No. 12AP-209, 2012-Ohio-5977, ¶ 23-26.

{¶30} In light of the above, we overrule Mr. Harmon's assignment of error.

III.

{¶31} The judgment of the Summit County Court of Common Pleas is affirmed, and Mr. Harmon's assignment of error is overruled.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

EVE V. BELFANCE
FOR THE COURT

WHITMORE, J.
HENSAL, J.
CONCUR.

APPEARANCES:

STEPHEN A. GOLDMEIER, Assistant State Public Defender, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.